UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

| | |
|---|---|
| LUSTER SMITH | CIVIL ACTION 1:16-CV-00223 |
| VERSUS | JUDGE DRELL |
| ALLSTATE INSURANCE COMPANY | MAGISTRATE JUDGE PEREZ-MONTES |

## OPINION

Plaintiff Luster Smith ("Smith") seeks payment, penalties and interest from Allstate Insurance Co. ("Allstate") pursuant to his homeowner's insurance policy. A trial on the merits was held before the undersigned. Because Allstate has shown by a preponderance of the evidence that Smith intentionally set the fire that destroyed his home, Smith's insurance claim is denied.

I.  **Background**

A.  **Procedural History**

Plaintiff Smith filed this action in a Louisiana state court against Allstate, claiming payment under a homeowner's insurance policy for the total destruction of his home by fire (Doc. 1-2). Allstate removed the action, premising jurisdiction on diversity (Doc. 1). Allstate answered the complaint, asserting the affirmative defense of arson and denying coverage (Doc. 4). Allstate alleged the evidence showed the fire was of incendiary origin, and Smith had a financial motive for intentionally destroying his home (Doc. 4).

## B. Trial Evidence

### 1. Eric Zeno (Neighbor)

Eric Zeno ("Zeno"), Smith's neighbor, testified he saw Smith leave the house early in the morning (the sun was up). Zeno was not sure what time he saw Smith leave, but said it could have been 6:00 a.m. (Day 1 of Trial, Witness 1). About 20 minutes after Smith left, Zeno saw smoke coming from Smith's house (Day 1 of Trial, Witness 1). Zeno went outside, saw other people gathered, and found someone had already called the Fire Department (Day 1 of Trial, Witness 1). Zeno saw Smith again when he returned to his house after fire trucks had arrived.

### 2. Kevin Smith (Plaintiff's Son)

Kevin Smith ("Kevin"), Smith's son, testified that he is in the Army (27 years) and the National Guard; he has one brother; his mother is no longer living; and his father is retired military (Day 1 of Trial, Witness 2). Kevin was living in Arkansas when the fire occurred on July 5, 2015, but still owned a house in Alexandria, Louisiana (Day 1 of Trial, Witness 2). Kevin had not been to his father's house since April 2015, but spoke to him every day on the telephone (Day 1 of Trial, Witness 2). A friend called Kevin and told him his father's house was on fire (Day 1 of Trial, Witness 2). Kevin contacted a neighbor, Ms. Cooks, who checked on his father,[1] then he spoke to his father by telephone (Day 1 of Trial, Witness 2). Kevin testified his father was crying and a little hysterical (Day 1 of Trial, Witness 2). The home was

---

[1] There was some dispute as to whether Kevin dated his friend, Ms. Cooks, before or after the fire (Day 1 of Trial, Witness 2). Kevin insisted he dated her after the fire occurred, for about 2 months, but he had known her since childhood.

an old, wood-frame house, and the kitchen had a bow in the floor (Day 1 of Trial, Witness 2). Kevin testified the refrigerator look like it could fall through the floor, due to the bow (Day 1 of Trial, Witness 2). The front of the house was destroyed by the fire, but the back of the house was not completely gone (Day 1 of Trial, Witness 2).

Kevin testified that his brother, Vallard Smith ("Vallard"), was working offshore at the time of the fire (Day 1 of Trial, Witness 2). Kevin did not know whether his father had considered filing for bankruptcy (Day 1 of Trial, Witness 2). Kevin was unaware his father owed about $48,000 to the IRS because he had not been paying his income taxes (Day 1 of Trial, Witness 2). He did not know whether Smith was having any financial difficulties (Day 1 of Trial, Witness 2). Smith had an IRS lien and had made arrangements to pay it (Day 1 of Trial, Witness 2).

Kevin testified he has things from his parents' home at his house because he (and his brother) took a few things after their mother passed away (Day 1 of Trial, Witness 2). Smith also kept a few clothes at Kevin's house because he occasionally spent a day there (Day 1 of Trial, Witness 2). After the fire, Smith stayed in Kevin's house (Day 1 of Trial, Witness 2). Smith continued to receive his mail at his own address for a while after the fire, because Smith forgot to have his mail forwarded to Kevin's house.

Kevin testified that his parents had owned the home since 1964, and they were married about 60 years (Day 1 of Trial, Witness 2). Kevin testified that, although the neighborhood had changed and become less safe, his father was very attached to his

house (Day 1 of Trial, Witness 2).  Kevin also testified that the lot itself meant something to them, since it had a large grapefruit tree, a plum tree, a fig tree, and two pecan trees (Day 1 of Trial, Witness 2).

### 3.   Anna Fuller (Neighbor)

Anna Fuller ("Fuller") testified that she had lived two houses down from Smith since 1976, and her sons played with his sons (Day 1 of Trial, Witness 3).  On July 5, 2015, a neighbor knocked on Fuller's door and told her son that Smith's house was on fire (Day 1 of Trial, Witness 3).   Fuller's son immediately told her, and Fuller drove to Kevin's house about 30 minutes later and told Smith about the fire (Day 1 of Trial, Witness 3).  Smith was surprised when she told him, threw his hands up in the air, shaking them, then got into his car and drove home (Day 1 of Trial, Witness 3).  Fuller did not know Smith was at Kevin's house, but Smith had told her he was staying at both houses and she had seen him at Kevin's house two or three weeks before, so she went to see if he was there (Day 1 of Trial, Witness 3).  Fuller further testified that she did not see Smith moving furniture out of his house (Day 1 of Trial, Witness 3).

After the fire, Fuller saw people taking wiring, Smith's air conditioner, and part of his fence (Day 1 of Trial, Witness 3).  Fuller did not recognize any of the thieves, but she said a lot of people walk through the neighborhood at all hours of the day and night (Day 1 of Trial, Witness 3).  Fuller testified Smith told her, later, that the fire had started from the refrigerator (Day 1 of Trial, Witness 3).

### 4.    <u>Mashack McCall, Jr. (Neighbor)</u>

Mashack McCall, Jr. ("McCall") testified that he had lived in the neighborhood for 60 years and across the street from Smith since Smith moved there (Day 1 of Trial, Witness 4).  McCall saw Smith the evening of July 4th when he took a plate of food to his house (Day 1 of Trial, Witness 4).  McCall left home between 7:30 and 8:00 a.m. the next morning to drive to his hunting camp (Day 1 of Trial, Witness 4).  McCall's wife called him about 45 minutes later to tell him Smith's house was on fire, and his car was not there (Day 1 of Trial, Witness 4).  McCall's wife called him again to report Smith was back home and trying to get into his house (Day 1 of Trial, Witness 4).  McCall's wife called him a third time to verify the fire was out, Smith was okay, and someone was going to pick him up (Day 1 of Trial, Witness 4).

McCall testified that he saw Smith's car at his house every day before the fire (Day 1 of Trial, Witness 4).  Before the fire, McCall did not see Smith move anything out of his house (Day 1 of Trial, Witness 4).  Two or three days after the fire, McCall saw thieves going in and out of Smith's house, taking things like a hot water heater and small boxes (Day 1 of Trial, Witness 4).  According to McCall, the neighborhood had changed over the years, had become "infested" with drugs, addicts, and homeless people, and had a lot of crime (Day 1 of Trial, Witness 4).  McCall testified that Smith's backyard was very vulnerable because there was a vacant house behind his house and a field next to his house (Day 1 of Trial, Witness 4).  Anyone could jump over Smith's backyard fence and enter his yard from the vacant house or the field (Day 1 of Trial, Witness 4).

When McCall went into Smith's house the evening before the fire, it looked like it always did, with plaques and things from the military, Smith's wife's teaching, the VA, and the VFW (Day 1 of Trial, Witness 4). Smith had a white stuffed animal in his living room and a big calendar (Day 1 of Trial, Witness 4). McCall testified that Smith checked his son's house every day, although not always at the same time of day (Day 1 of Trial, Witness 4).

### 5. Luster Smith (Plaintiff)

Smith testified he was 75 years old when the fire occurred (Day 1 of Trial, Witness 5). He and his wife were married almost 50 years when she passed away, and he has two sons (Day 1 of Trial, Witness 5). Smith was in the military for 20 years, then he worked at the VA Medical Center in Pineville, Louisiana for 25 years (Day 1 of Trial, Witness 5). Smith's wife taught school (Day 1 of Trial, Witness 5). Smith receives retirement pay from the military and the VA, as well as Social Security, for a total of $2,898.16 per month (Day 1 of Trial, Witness 5).

Smith has received the National Defense Service Medal, the Good Conduct Medal, the Meritorious Service Medal, a Bronze Star, Service Stars, the Republic of Vietnam Campaign Medal, a Bronze Star with Device Expert, and a Purple Heart (Day 1 of Trial, Witness 5). Some of those awards were destroyed in the fire, and some were only charred (Day 1 of Trial, Witness 5). All of Smith's awards were in the fire (Day 1 of Trial, Witness 5). Smith testified that, after the fire, he went into the house and retrieved the 2012 calendar with his wife's date of death circled, and a teddy bear ("Pookie") he had given her (Day 1 of Trial, Witness 5).

Smith testified his father-in-law purchased the house for his wife in the 1960s and they immediately insured it through Allstate (Day 1 of Trial, Witness 5). They paid $8,700 for the house, paid it off, then mortgaged it again for $40,000.00 (for remodeling) about 15 years before the fire (Day 2 of Trial, Witness 1). Smith finished paying the second mortgage off after the fire (Day 1 of Trial, Witness 5). Smith paid the premiums on the Allstate homeowner's insurance policy through the date of the fire (Day 1 of Trial, Witness 5).

Smith testified that, although he said in his first deposition that he had not gone into the house after the fire, he had forgotten about retrieving the calendar and the teddy bear Pookie a couple of days after the fire (Day 1 of Trial, Witness 5). Smith had also said a fireman had given them to him, which was not correct (Day 1 of Trial, Witness 5). Smith said his memory became clearer about a week after the fire (Day 1 of Trial, Witness 5). Smith said both the bear and calendar were smoky but not burned because they were in his wife's bedroom, which did not burn (Day 1 of Trial, Witness 5). The teddy bear was a little discolored from smoke (Day 1 of Trial, Witness 5). Smith wiped the bear down but it is still discolored (Day 1 of Trial, Witness 5). Smith did not remove any medals from his house (Day 1 of Trial, Witness 5). Smith said he stayed shaky for about six months after the fire (Day 1 of Trial, Witness 5).

Smith testified he always gets up at 5:00 a.m., has breakfast, and dresses (Day 1 of Trial, Witness 5). On the day of the fire, he checked on Kevin's house after breakfast, about 6:00 or 6:15 a.m. (Day 1 of Trial, Witness 5). Smith checked Kevin's house three or four times per week, at different times of the day (Day 1 of Trial,

Witness 5).  Smith never lived for any protracted time in Kevin's house, and all of Smith's belongings were in his own home (Day 1 of Trial, Witness 5).  Kevin did not have a TV or radio at his house (Day 1 of Trial, Witness 5).  Anna Fuller went to Kevin's house to tell Smith his house was on fire, which shocked Smith (Day 1 of Trial, Witness 5).

At least a week after the fire, an Allstate representative (Childs) visited Smith at Kevin's house and took a picture of him with the teddy bear Pookie and the calendar (Day 1 of Trial, Witness 5).  Smith was still not fully alert and was somewhat confused (Day 1 of Trial, Witness 5).  The fire was of incendiary origin and gasoline was used to start it, possibly from a weed eater that was in the kitchen (Day 1 of Trial, Witness 5).

Smith said he owed the IRS money, but had been paying them $191.00 every month from his Social Security check for ten years, and is still doing so (Day 1 of Trial, Witness 5).  Smith owed two separate tax debts to the IRS for non-payment of income taxes—one for $1,270 and one for about $47,900 (Day 2 of Trial, Witness 1).  Smith had been repaying the smaller tax debt, and was not yet repaying the larger debt (Day 2 of Trial, Witness 1).  Smith stated in his sworn statement that he had intentionally not paid his income taxes for ten years because he believed he would be dead before the IRS could collect those taxes from him (Day 2 of Trial, Witness 1).  The IRS placed a lien on his house for the tax debts and began garnishing his Social Security checks (Day 2 of Trial, Witness 1).  Smith also testified that he does not pay state taxes (Day 2 of Trial, Witness 1).

Smith finished paying his mortgage after the fire (Day 1 of Trial, Witness 5). Before Smith finished paying his mortgage, his monthly expenses (including the IRS lien payments) were $2,352.42 per month, and he had between $400 and $500 left over every month (Day 1 of Trial, Witness 5). Also, his wife worked as a school teacher (Day 1 of Trial, Witness 5). Smith testified he has never had financial problems, he lived within his means, has never filed for bankruptcy, and has no intention of filing for bankruptcy (Day 1 of Trial, Witness 5).

Smith told the IRS investigator that he knew the IRS debt would be paid from his insurance check, but testified that he did not actually know that until later (Day 2 of Trial, Witness 1). Smith testified that he hired a tax service to help him deal with the IRS, but they had not done anything after he paid them $7,000, so he stopped paying them (Day 2 of Trial, Witness 1). Smith also spoke to a tax attorney, but never hired him (Day 2 of Trial, Witness 1). Smith spoke directly to someone with the IRS one time (Day 2 of Trial, Witness 1). Smith told an Allstate adjuster he had never received notification that there was a lien on his house, but admitted his Social Security checks were garnished because of the tax lien, and admitted he received notice that his checks would be garnished (Day 2 of Trial, Witness 1). Smith stated in his September 2015 statement that he did not realize the IRS would be paid first from his Allstate claim (Day 2 of Trial, Witness 1).

Smith testified that he did not know anything about a recorded ten-year-old judgment against him, in favor of First Deposit National Bank for $4,146, that was

never cancelled (Day 2 of Trial, Witness 1). Smith did not recall the judgment, being sued, or paying a judgment (Day 2 of Trial, Witness 1).

Smith denied considering filing for bankruptcy within the five years prior to the fire (Day 2 of Trial, Witness 1). Smith had debts of $26,209 (including his mortgage), as well as his debts to the IRS, for a total debt of over $70,000 at the time of the fire (Day 2 of Trial, Witness 1). The mortgage was paid off after the fire (Day 2 of Trial, Witness 1). Apparently, Smith forgot to tell Allstate about a monthly payment he was making to Tower Loan (Day 2 of Trial, Witness 1). Smith testified that, even if he did not list his monthly expenses correctly, his monthly income still exceeded his monthly expenses (Day 2 of Trial, Witness 1). Smith was not behind on any of his bills and he always had enough income to pay all of his bills (Day 2 of Trial, Witness 1).

Smith testified that, the day of the fire, he does not think he locked the door when he left his house because he was not going far (Day 1 of Trial, Witness 5). There was no evidence of a forced entry or theft prior to the fire (Day 1 of Trial, Witness 5). Smith left his home between 6:00 and 6:15 a.m. and arrived at his son's house about 20 minutes later (Day 1 of Trial, Witness 5). Smith admitted he may have said his kitchen floor was not in need of repair and was not sinking because it did not bother him (Day 1 of Trial, Witness 5). Smith did not intend to mislead or defraud Allstate, and if he gave inconsistent statements, he was very upset and did not do so intentionally (Day 1 of Trial, Witness 5). He had lived in the house for almost 50 years (Day 1 of Trial, Witness 5).

Smith also denied speaking to Cooks (Kevin's friend) at the scene, saying he did not know her at the time, though she apparently handed him a phone (Day 1 of Trial, Witness 5). Smith testified that Toni Cooks (Hudson) would not have known he was at his son's house because he had only ever seen her twice: (1) the morning of the fire; and (2) once after the fire, when she dated Kevin (Day 2 of Trial, Witness 1).

Smith testified he may also have failed to say he had a weed eater in his kitchen and an empty gas can under his carport when he first spoke to the Allstate attorney (Day 1 of Trial, Witness 5). No weed eater or gas can was ever found by the investigators (Day 1 of Trial, Witness 5). Smith said all of his tools (hammer, saws, screw drivers) were gone (Day 1 of Trial, Witness 5). Smith testified the only way gasoline could have been in the kitchen was from the weed eater (Day 1 of Trial, Witness 5). Smith also testified he had never lived in Kevin's house for days, weeks, or months before the fire (Day 1 of Trial, Witness 5).

Smith testified he was told by Allstate that the fire had been started by gasoline on the kitchen floor, and it was intentionally set (Day 2 of Trial, Witness 1). Smith testified he was still not thinking clearly three months after the fire, when he gave a sworn statement in September 2015 (Day 2 of Trial, Witness 1). Smith said first heard about the gasoline from Rick Gilly, an Allstate employee (Day 2 of Trial, Witness 1). However, in his September statement, Smith said he first heard about the gasoline in September, from Allstate's attorney. Smith testified he never accidentally or intentionally poured gasoline on his kitchen floor and set fire to his home (Day 2 of Trial, Witness 1).

Smith testified that, when he and his wife remodeled the house, the kitchen was converted from gas to electricity (Day 2 of Trial, Witness 1). Smith testified that, when he stated in September 2015 that nothing had ever been done to the wiring in the house, that was not true as to the kitchen (Day 2 of Trial, Witness 1). New wiring was put in the kitchen because it was expanded, but the rest of the house was not rewired (Day 2 of Trial, Witness 1).

Smith testified he did not want to enter his house after the fire, but he did (Day 2 of Trial, Witness 1). Part of the house was not destroyed, and only had smoke and heat damage (Day 2 of Trial, Witness 1). Smith remembered an insurance investigator making an inventory, but did not recall refusing to enter the house with her (Day 2 of Trial, Witness 1). In September 2015, Smith stated he did not know of anything being missing before the fire (Day 2 of Trial, Witness 1).

In November 2015, Smith said in a supplemental statement that he did not know anything about a defect in his kitchen floor or foundation problems causing the floor to sink (Day 2 of Trial, Witness 1). Smith testified at trial that he did not know anything about the kitchen floor sinking and did not recall discussing it with his son, but it was possible (Day 2 of Trial, Witness 1). Smith stated in a previous affidavit that, although he knew his kitchen floor was sinking, he did not think of it as defective (Day 2 of Trial, Witness 1). Smith explained that a sinking kitchen floor was a normal situation for him since he had lived in the house so long, and he did not pay attention to it (Day 2 of Trial, Witness 1). He did not consider a sinking floor to be a defect, since the house was 75 years old (Day 2 of Trial, Witness 1).

Smith admitted he had cooked breakfast the morning of the fire, and turned the stove off after cooking (Day 2 of Trial, Witness 1). Smith further admitted he kept his tools and weed eater stored next to the refrigerator, between the freezer and the sliding glass door (Day 2 of Trial, Witness 1). Smith did not know whether there was any gas in the weed eater at the time of the fire (Day 2 of Trial, Witness 1). Smith admitted that his previous statement, that he had used the weed eater about a month before, was not true (Day 2 of Trial, Witness 1). In his September 2015 statement to an investigator, Smith admitted he did not like yard work, had not done any in a while, and had not used his weed eater in years, although he had previously stated it had only been three months (Day 2 of Trial, Witness 1). Smith testified the only thing he had in the house that the gasoline could have come from was the weed eater (Day 2 of Trial, Witness 1). Smith stated he thought he locked the house when he left that morning, but also stated he did not usually lock it if he was going to be gone for only a short while (Day 2 of Trial, Witness 1). The investigator told Smith that no tools or weed eater were found after the fire (Day 2 of Trial, Witness 1). Smith stated they were probably stolen (Day 2 of Trial, Witness 1). V

The day before the fire was July 4 and Smith could not remember whether he went anywhere (Day 2 of Trial, Witness 1). Smith testified he does not usually go anywhere on July 4, but might have told the Allstate investigator that he had gone to a VFW dance (apparently in an attempt to impress her) (Day 2 of Trial, Witness 1). Smith got up at 5:00 a.m. the next morning, but did not go to church (although he was a deacon). Smith stated he left his house between 6:00 and 6:30 a.m. on the

morning of the fire and went directly to his son's house (Day 2 of Trial, Witness 1). If he told the Allstate fire investigator that he left his house at 7:00 a.m. that morning, that statement was wrong (Day 2 of Trial, Witness 1).

Smith had been gone from his home about an hour when Anna Fuller knocked on Kevin's door and told Smith his house was on fire (Day 2 of Trial, Witness 1). Smith thought Anna knocked on the door between 7:00 and 7:30 a.m. (Day 2 of Trial, Witness 1). However, since the fire did not occur until about 8:45 a.m., it must have been later (Day 2 of Trial, Witness 1). Smith thought he had locked his house when he left, but he did not really remember (Day 2 of Trial, Witness 1). Smith also testified that he was 76 years old, but he did not have Alzheimer's disease (Day 2 of Trial, Witness 1).

Smith denied that he ever spent the entire night at Kevin's house (Day 2 of Trial, Witness 1). Smith checked on Kevin's house in the morning and sometimes checked on it in the evening and stayed a while, just to let people know someone was there, but he did not spend the whole night or live there because there were no conveniences such as a TV, radio, washing machine, dryer, or microwave (Day 2 of Trial, Witness 1). Smith likes to read, so he kept a few books at Kevin's house (Day 2 of Trial, Witness 1). Smith admitted he might have told the Allstate investigator (Childs) he "seldom" spent the night at Kevin's house (Day 2 of Trial, Witness 1). Smith also admitted he may have told her he liked to watch TV at his son's house, even though there was no working TV (Day 2 of Trial, Witness 1). Smith stated he may have been telling her what he did at his own house, although she had apparently

asked about Kevin's house (Day 2 of Trial, Witness 1). After the fire, Smith stayed at Kevin's house and had his telephone land line moved there (Day 2 of Trial, Witness 1). Although all of Smith's bills were sent to his house, in June 2015 Smith filled out an application for a credit card at WalMart with his son Kevin's address (Day 2 of Trial, Witness 1). Apparently, both his and Kevin's addresses were provided (Day 2 of Trial, Witness 1).

Smith testified the teddy bear Pookie and the calendar were sitting in his wife's bedroom on a gold chair from Japan that was close to the outer wall (Day 2 of Trial, Witness 1). Smith testified the teddy bear did not burn, but had some smoke and heat damage (Day 2 of Trial, Witness 1). Smith wiped away some of the residue that was on it (Day 2 of Trial, Witness 1). The bear was originally white, and is now a dusty-looking off-white (Day 2 of Trial, Witness 1). Smith noticed his wife's hope chest was also okay (Day 2 of Trial, Witness 1).

Smith initially thought, and stated, a fireman or policeman must have brought the teddy bear and calendar out to him (Day 2 of Trial, Witness 1). Smith told Allstate's investigator the firemen had given them to him (Day 2 of Trial, Witness 1). Smith told Allstate's attorney that if he had gone into the house, he would have gotten his medals and the pictures of his wife (Day 2 of Trial, Witness 1). Smith also thought the firemen had gotten several things out of his house for him, such as medals and year books, but the firemen said they did not take anything out of the house and Smith cannot find those items (Day 2 of Trial, Witness 1). Smith testified at trial

that he entered his house on July 7th and picked up the teddy bear and some of his charred medals (Day 2 of Trial, Witness 1).

Smith testified that, after he began thinking more clearly, he did not go to Allstate and correct his misstatements because he did not realize what he had been saying to Allstate (Day 2 of Trial, Witness 1).

### 6. Barbara Ann Cole (Neighbor)

Barbara Ann Cole ("Cole") testified that she had lived in Smith's neighborhood for 55 years (her entire life), and her house was across the street and a few houses down from Smith's home (Day 1 of Trial, Witness 6). Cole's husband, Randy Cole, cut Smith's grass, using his own mower, weed eater, and gasoline (Day 1 of Trial, Witness 6). Cole testified she washed her car the morning of the fire, from after 7:00 a.m. to about 8:45 a.m. (Day 1 of Trial, Witness 6). Cole first noticed smoke in the sky, smelled something burning, walked down the street, and saw black smoke coming from Smith's house (Day 1 of Trial, Witness 6). Another neighbor had already called the fire department (Day 1 of Trial, Witness 6). Cole then went to Anna Fuller's home to see if she knew how to get in touch with Smith (Day 1 of Trial, Witness 6). Cole testified Fuller said Smith had been "staying with his son" (Day 1 of Trial, Witness 6).

### 7. Randy Cole (Neighbor)

Randy Cole testified that he had known Smith for about 12 years, and had been mowing his yard every two weeks for about eight years (Day 1 of Trial, Witness 7). Randy Cole used his own mower, weed eater, and gasoline to mow Smith's yard

(Day 1 of Trial, Witness 7). Randy never saw a gas can under Smith's carport, and never knew of Smith cutting his own grass (Day 1 of Trial, Witness 6). Randy testified that Smith was not always at home, but he always returned home (Day 1 of Trial, Witness 7).

### 8. Thomas Force (Expert Witness)

Thomas Force ("Force"), a firefighter and fire prevention officer with the Alexandria Fire Department, was accepted as an expert in the field of investigation, origin, and cause of fires (Day 2 of Trial, Witness 2). Force was the senior officer on site during the fire at Smith's home (Day 2 of Trial, Witness 2).

Force testified that no one asked him about retrieving anything from Smith's home (in accordance with department policy), and none of the firefighters there remember Smith asking for anything from his house (Day 2 of Trial, Witness 2). Force did not see the teddy bear or the calendar in any pictures of the fire scene, or in the bedroom (Day 2 of Trial, Witness 2). Force testified the bear in the photo did not look like it had been in a fire because it was not sooty, wet, wrinkled, burned, or damaged by fire suppression efforts, and its eyes were not melted (Day 2 of Trial, Witness 2). The gold chair the bear and calendar were supposed to have been on had extensive fire and heat damage (Day 2 of Trial, Witness 2). When the bear was introduced into evidence, Force said it could not have been in the room during the fire because it would have a lot more damage (Day 2 of Trial, Witness 2). Since the bear is synthetic, it would have melted at a fairly low temperature and would have more damage even if the soot was washed off (Day 2 of Trial, Witness 2). Force also testified

that the calendar, which appeared to be a coated paper, would have been partially burned at a minimum, given the fire conditions in the room (Day 2 of Trial, Witness 2). The room was damaged by the fire, or the heat and smoke from the fire, so the bear would have been damaged also (Day 2 of Trial, Witness 2).

Force also did not see a weed eater, and did not recall seeing a gas can (Day 2 of Trial, Witness 2). The fire started in the kitchen near the refrigerator and freezer (Day 2 of Trial, Witness 2). Force determined the fire was caused by human involvement, pouring gasoline in the kitchen and starting it (Day 2 of Trial, Witness 2). An arson investigation was opened and is technically still open, although there is no longer any active work being done on the case (Day 2 of Trial, Witness 2). Although there is no evidence that Luster Smith was responsible for the fire, Smith could not be ruled out as a suspect (Day 2 of Trial, Witness 2).

### 9. Kerri Steger (Allstate Adjuster)

Kerri Steger ("Steger") testified that she is a contents large loss adjuster for Allstate (Day 3 of Trial, Witness 1). Steger inventories contents after a loss, large losses only (Day 3 of Trial, Witness 1). Steger inventoried Smith's house on July 8, 2015 (Day 3 of Trial, Witness 1). Smith told her he could not go into the house with her and was very emotional (Day 3 of Trial, Witness 1). Steger went through the house, took photographs, then went out and talked to Smith twice before she started the inventory (Day 3 of Trial, Witness 1). Steger testified that, in Smith's wife's bedroom, the clothes were melted off the hangers, there was heavy soot and smoke, and there was a large hole in the wall from the kitchen (Day 3 of Trial, Witness 1).

Steger did not see a large white teddy bear or a 2012 calendar in the house (Day 3 of Trial, Witness 1). The chairs in Smith's wife's bedroom were sooty, charred, and had heat damage (Day 3 of Trial, Witness 1). Anything sitting on the chairs would have had the same damage (Day 3 of Trial, Witness 1). Steger testified the calendar and bear should have had heavy smoke and soot on them if they were in the bedroom, so she did not think they were in the bedroom during the fire (Day 3 of Trial, Witness 1). Steger did not think the bear and calendar in the photograph could have been in the bedroom during the fire because everything in that room was heavily smoked, sooty, and/or partially burned (Day 3 of Trial, Witness 1). Steger further testified that, to clean something like a stuffed animal, just wiping it down will not get the soot and odor out of it (Day 3 of Trial, Witness 1).

The only thing Steger took from the house and gave to Smith was a box with his wife's funeral programs that had been in the front middle bedroom closet (Day 3 of Trial, Witness 1). Steger testified she sends everything to be cleaned that could possibly be salvaged (Day 3 of Trial, Witness 1). If something cannot be cleaned, she has to list it as a total loss (Day 3 of Trial, Witness 1). Nothing in Smith's home was salvageable (Day 3 of Trial, Witness 1). Steger did not find any tools or a weed eater in Smith's house (Day 3 of Trial, Witness 1).

Steger inventoried Smith's house five days after the fire (Day 3 of Trial, Witness 1). If a claimant tells her something has been stolen and it was damaged by the fire, she includes it in her inventory (Day 3 of Trial, Witness 1). If something was stolen that was not damaged, the claimant is instructed to file a theft report with a

law enforcement agency and a separate claim with Allstate (Day 3 of Trial, Witness 1).

### 10.   Daniel Snow (Expert Witness)

Daniel Snow ("Snow"), a retired forensic consultant and expert in the origin and cause of fires and explosions, testified that he was employed by Allstate to investigate the fire (Day 3 of Trial, Witness 2).  Snow found the heaviest damage in the southwest corner of the kitchen (Day 3 of Trial, Witness 2).  Snow sent a piece of the wood flooring from the kitchen to a lab, which found it had evaporated gasoline and no oil (Day 3 of Trial, Witness 2).  Snow concluded a "good amount" of gasoline was poured on the floor and intentionally ignited, causing the house fire (Day 3 of Trial, Witness 2).  Snow also found the glass on the sliding glass doors in the kitchen had burst outward (Day 3 of Trial, Witness 2).  Snow did not find anything that could have accidentally caused the fire (Day 3 of Trial, Witness 2).  Snow also did not find any remnants of a weed eater or other tools in the house (Day 3 of Trial, Witness 2).  Snow also testified that a weed eater was not responsible for the gasoline on the kitchen floor because there was no oil mixed in with the gas (Day 3 of Trial, Witness 2).

Snow stated he did not think the bear could have been in the house during the fire because its synthetic fur was not sooty or melted (Day 3 of Trial, Witness 2).  Snow also stated the bear would still smell like smoke (Day 3 of Trial, Witness 2).  The calendar would have been burned completely, given the temperatures in that

room (Day 3 of Trial, Witness 2).  In Snow's opinion, given the time line established by the testimony, Smith set the fire in his house (Day 3 of Trial, Witness 2).

### 11.　Linda Childs (Investigator)

Linda Childs ("Childs") testified that she is a self-employed private investigator who was employed by Allstate to gather information, canvass witnesses, and preserve evidence on Smith's claim (Day 3 of Trial, Witness 3).  Childs testified Smith told her two different stories about the bear when she interviewed him: (1) that a firefighter brought the bear out to him; and (2) that he got the bear out of the house himself (Day 3 of Trial, Witness 3).  Childs did not notice any fire damage to either the bear or the calendar (Day 3 of Trial, Witness 3).

### 12.　Fernando I. Morales, Jr. (Investigator)

Fernando I. Morales, Jr. ("Morales") testified that he is a special investigator ("senior claims analyst") employed by Allstate (Day 3 of Trial, Witness 3).  Morales testified Smith's case was sent to the special claims department because it was incendiary and there were financial distress issues, which indicate a potential for fraud or deception on the part of the insured (Day 3 of Trial, Witness 3).  Rick Gilly was the structure adjuster.  Steger's job was contents, and Gilly employed Dan Snow to investigate.  Sandra Hendricks was the first special investigator, but the claim was passed to Morales when she became ill (Day 3 of Trial, Witness 3).  Hendricks took a detailed statement from Smith, so Morales did not need to (Day 3 of Trial, Witness 3).  Morales hired Childs to canvass witnesses (Day 3 of Trial, Witness 3).

Morales recommended denying the claim (Day 3 of Trial, Witness 3). Gilly's assessment of the value of the home was between $30,000 and $40,000, but the coverage limit (to rebuild) was much higher than that (Day 3 of Trial, Witness 3). Morales found the IRS lien of $47,967 was an indication of financial distress (Day 3 of Trial, Witness 3). Smith's claim was worth $203,000, which would have been paid to the IRS (first) and Smith (Day 3 of Trial, Witness 3). Smith would not have received enough to replace his house (Day 3 of Trial, Witness 3). However, if the claim was paid, Smith could live in Kevin's house for two years and his sons would not later inherit the tax liens (Day 3 of Trial, Witness 3).

Morales testified that Allstate also investigated the issue of whether Smith occupied his home for 60 days before the fire, but did not deny his claim on that basis (Day 3 of Trial, Witness 3). The basis for the denial of Smith's claim was arson (Day 3 of Trial, Witness 3).

## II.  Law and Analysis

### A.  Burden of Proof

A denial of liability based on arson, by a fire insurer sued on a fire insurance policy, is an affirmative defense.  See Miley v. U.S. Fid. & Guar. Co., 94-1204 (La. App. 1st Cir. 4/7/95, 3), 659 So.2d 792, 794, writ denied, 95-1101 (La. 6/16/95), 660 So.2d 436.  Under Louisiana law,[2] to sustain the defense of arson, or incendiarism, insurers bear the burden of proving the defense by a preponderance of the evidence.

---

[2] Because this case falls within federal diversity jurisdiction, we must apply Louisiana law. See Wilson v. State Farm Fire & Cas. Ins. Co., 178 Fed. Appx. 437, 440 (5th Cir.2006) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938)).

See Wilson v. State Farm Fire & Cas. Ins. Co., 178 Fed. Appx. 437, 440 (5th Cir. 2006), cert. den., 54 U.S. 888 (2006) (citing Sumrall v. Providence Washington Ins. Co., 221 La. 633, 60 So.2d 68, 69 (1952)).  Recognizing that in most cases the only evidence of arson is circumstantial due to the fact that perpetrators of incendiarism do not engage in such activity notoriously, the Louisiana Supreme Court has repeatedly stated that:

> Inasmuch as the defense is arson, the burden rested upon the insurer to establish, by convincing proof, that the fire was of incendiary origin and that plaintiff was responsible for it.  It is well settled that the insurer need not prove its case against a plaintiff beyond a reasonable doubt; it suffices that the evidence preponderates in favor of the defense.  Proof, of course, may be and invariably is entirely circumstantial.  And, in these instances, a finding for defendant is warranted where the evidence is of such import that it will sustain no other reasonable hypothesis but that the claimant is responsible for the fire.

See id.; Rist v. Commercial Union Ins. Co., 376 So.2d 113, 113-14 (La. 1979).  As an evidentiary matter, "[m]otive plus the incendiary origin of the fire [will], in the absence of believable rebuttal evidence, be sufficient to sustain the affirmative defense pleaded by the insurer."  See Wilson, 178 Fed. Appx. at 440 (citing Sumrall, 60 So.2d at 70); see also Ashworth v. State Farm Fire & Cas. Co., 738 F. Supp. 1032, 1034 (W.D. La. 1990).

Louisiana law requires the insurer to prove the claimant was in "dire financial straits" before it would be proper for a court to infer from circumstantial evidence that he had the motive necessary to commit arson.  See Wells v. State Farm Fire & Cas. Co., 2013 WL 6044371, at *3 (E.D. La. 2013) (citing Wallace v. State Farm Fire & Cas. Ins. Co., 345 So.2d 1004, 1007, writ ref'd, 349 So.2d 334 (La. 1977) (insured was not in such dire financial condition as to motivate him to commit arson)); see also

Kelly v. Commercial Union Ins. Co., 709 F.2d 973, 976 (5th Cir. 1983) (the court was not convinced that the plaintiffs' financial status was such as would motivate a person to burn down his property); Evans v. State Farm General Ins. Co., 36,539 (La. App. 2d Cir. 12/11/02), 833 So.2d 1143, 1147, writ den., 2003-0125 (La. 3/21/03), 840 So.2d 539 (although insureds were not in "deep" financial need due to a prior bankruptcy, the amount of the claim greatly exceeded the value of the property, creating a financial motive for arson).

The incendiary nature of the fire is not disputed by Smith (Doc. 62, p. 2/13). Smith contends there is no direct evidence that he is responsible for setting the fire, and that he did not have a financial motive to destroy his home. Smith argues he was not deeply in debt, he had a good income, and he was always able to pay all of his bills every month.

The parties dispute Zeno's testimony. Zeno was uncertain as to the time Smith left his home and did not establish a time line, but he saw smoke about 20 minutes after Smith left. The time the smoke was seen by other neighbors and the fire department was called, sometime between 8:15 and 8:45, is established with more certainty.[3] The fire department reports show the incident occurred at 8:45 a.m. (it is unclear whether that is when the neighbors reported the fire or when the fire trucks arrived at the scene). Although Smith contends he left his home between 6:00 and 6:30 a.m., his testimony is self-serving and is not supported by any other testimony

---

[3] Zeno testified he saw smoke coming from Smith's house about 20 minutes after he saw Smith drive away, but Zeno was uncertain what time that was. McCall testified his wife saw smoke sometime between 8:15 and 8:45 a.m. Cole saw smoke about 8:45 a.m., then walked down the street to Fuller's house. Fuller said the fire trucks arrived sometime between 9:00 and 10:00 a.m.

or evidence. Smith clearly had the opportunity to start the fire in his house before he left that morning. Smith's testimony that he was not home at the time of the fire is, likewise, self-serving and uncorroborated.

Neither Smith nor anyone else was able to provide another explanation as to how and why gasoline was ignited on his kitchen floor. Smith's claim that his weed eater must have leaked is contradicted by the physical evidence that there was no oil in the gasoline found on the floor. No one was able to verify Smith's statements that he had a weed eater in his kitchen, or that he kept a gas case under his carport. Instead, the evidence established that Randy Cole cut and trimmed the grass in Smith's yard with his own tools and gasoline, and Cole had never seen a weed eater or a gas can at Smith's house.

No one saw anyone other than Smith leaving his house the morning of the fire, and no one was able to suggest a person, other than Smith, who may have had a motive to set Smith's house on fire.

The parties argued extensively about the teddy bear Pookie at trial. Smith testified he removed the bear and a calendar from the house two days after the fire. Allstate argues, however, that the bear and calendar must have been removed before the fire. Again, Allstate's theory is that the bear and calendar had sentimental value for Smith, and that their removal from the house before the fire – and Smith's lack of candor about the same – are powerful evidence that Smith intentionally started the fire. The Court agrees.

All testifying fire investigators were unanimous in their opinion that the bear and the calendar could not have been in the house fire because they did not have smoke or heat damage. The physical items were admitted into evidence and shown to witnesses at trial. They bore no semblance of the damage suffered by any other item in Smith's house. Smith testified the items were stored on a gold chair. Photos of the chair were also admitted and compared to the bear and calendar. The chair, and the items and walls around it, suffered extensive fire damage. The bear and the calendar, however, were aged, disclored (almost certainly from age), but bore neither visual nor olfactory evidence, of any kind, that they were exposed to the fire. All of this evidence and testimony supported a plain conclusion. Smith's testimony that he did not remove the items before the fire is simply implausible and unsupportable.

Smith further contends he did not have a motive for destroying his home. Allstate's theory is that Smith wanted to destroy his insured property in order to have enough money (from insurance) to pay his debt to the IRS. Smith argues he had already paid one debt to the IRS over the last ten years, and would have no problem paying off the second debt. However, Smith's second debt was much larger than the first, and he had not begun paying it. Smith could probably foresee a larger payment, and thus a smaller monthly income than he had been enjoying. The insurance money would enable Smith to pay off his tax debt, so his sons would not later inherit it. Moreover, Smith's tax debt to the state had not yet been realized. A second tax debt payment would decreased his monthly income even further.

Smith's financial circumstances were sufficiently dire to motivate him to commit arson. Therefore, Smith had a financial motive for destroying his home.

Although lengthy arguments are made in the post-trial briefs about Smith's misrepresentations, Special Investigator Morales clearly testified that Smith's claim was denied because of arson. He explained that Smith's inconsistent statements tended to make Allstate believe some statements were false, which led Allstate to look for the reason for his misrepresentations (Day 3 of Trial, Witness 3). The inconsistencies weighed against Smith in Allstate's arson determination.

Smith's inconsistent statements also weigh against him here. Even allowing for inconsistencies due to age and upset, Smith's testimony was not fully credible. In particular, Smith offered conflicting stories about how he came to possess the teddy bear and the calendar at his son's house, and how they were both unscathed by fire. Smith also offered inconsistent statements as to how much time he had been spending at his son Kevin's house and whether or not he had been living there part time; his financial circumstances, including his tax debts to the IRS; whether his son Vallard Smith was offshore at the time of the fire and when he last saw him; whether he had locked the doors of his house on the day of the fire; and the nature of his dealings with the IRS to repay his tax debts.

Material misrepresentations were not the basis for Allstate's denial and, thus, may not form the basis of this Court's decision. But they do militate heavily in favor of the Court's finding regarding the actual basis of Allstate's denial.

Under the facts of this case, Allstate established by a preponderance of the evidence that the fire in Smith's home was of incendiary origin and that Smith had a financial motive and an opportunity to cause the fire. The preponderance of the evidence shows that Smith intentionally caused the fire in his house. Therefore, Smith's claim for payment, penalties, and interest under his homeowner's insurance is denied.

## III. <u>Conclusion</u>

Accordingly, pursuant to a judgment issued this day, Luster Smith's claim for payment, penalties, and interest under his Allstate homeowner's insurance policy is denied and dismissed with prejudice.

THUS ORDERED AND SIGNED in Chambers at Alexandria, Louisiana on this  19th  day of April, 2018.

Joseph H.L. Perez-Montes
United States Magistrate Judge